UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-202-P-H |
| | ) | |
| ANTHONY DINGLE-JONES, | ) | |
| | ) | |
|       Defendant | ) | |

RECOMMENDED DECISION ON MOTION TO SUPPRESS

The defendant, charged with possession with intent to distribute 5 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), moves to suppress the drugs found on his person and incriminating statements he may have made on October 23, 2008. An evidentiary hearing was held before me on January 26, 2009, at which the defendant appeared with counsel. Four witnesses testified for the government, and three exhibits offered by the government were admitted without objection. I recommend that the following findings of fact be adopted, and that the motion be denied.

**I. Proposed Findings of Fact**

Wayne Clifford, an eight-year veteran of the Lewiston police force assigned to the Drug Enforcement Agency ("DEA") Task Force for the past two years, works closely with confidential informants in the course of investigating drug crimes. On October 23, 2008, he and fellow DEA Task Force Agent Michael Dumond, a seven and a half year veteran of the Lewiston police force with one and a half years on the Task Force, met with two individuals who wished to remain anonymous, one of whom had contacted Clifford in order to provide him with information. That individual, referred to at the hearing as Source of Information #1 ("SOI #1"),

1

was known to Clifford over a period of four years as a person with a history of drug-related criminal charges. Clifford had been present when SOI #1 was arrested for violation of the conditions of his probation. Approximately a week before the events of October 23, 2008, SOI #1 had provided information to Clifford about a "crack house" in Lewiston and a house in Auburn where crack cocaine was being sold. Clifford also had information on the house in Auburn from a separate source.

      Surveillance on the Auburn house resulted in the sighting of a known user or distributor of crack cocaine leaving the house. During surveillance on the Lewiston location, numerous known users of crack cocaine were seen coming and going. Crack cocaine had taken a severe toll on SOI #1's life. Clifford did not register him as a confidential informant because he believed that SOI #1 was still using crack cocaine, and, indeed, SOI #1 told him on October 23 that he had purchased crack cocaine within the past 12 hours. No charges were pending against SOI #1 on that date, he was not paid for the information he volunteered, he was not on probation, and no inducement of any kind was offered to him. Between obtaining this information from SOI #1 and approximately a week later on October 23, 2008, Clifford did not investigate SOI #1's background in any way. Neither of the agents had met the second source of information ("SOI #2") who came along with SOI #1 on October 23, and they have had no contact with SOI #2 since that day. It was apparent that these two individuals knew each other. No criminal charges were then pending against SOI #2, he or she was not on probation, and no inducement was offered. The agents have not investigated SOI #2's background.

      At around 2:10 p.m. on October 23, SOI #1 called Clifford, who was then with Dumond in his unmarked vehicle. Clifford arranged to pick up the SOIs at a site in downtown Lewiston. After getting into the back seat, the SOIs said that a black male from the Boston area was in town

selling a large amount of crack cocaine, and that they had each bought crack cocaine from him within the past 12 hours. Neither SOI appeared to be under the influence of drugs or alcohol. They appeared to have met with the seller separately.

They described the seller as having a large build, being over 6 feet tall, and weighing more than 230 pounds, which was Clifford's approximate weight at the time. They said that the man had ties to an apartment at 111 Ash Street, a building that they pointed out to the agents as they drove by it. They said that the man had arrived in Lewiston about 12 hours earlier having been given a ride by a friend when he either missed the bus by which he usually traveled from the Boston area to Lewiston or chose not to take that bus. They said that the man bragged that he had never been arrested for his drug sales, but that he had "caught a gun case," which the SOIs took to mean that he had been arrested and charged with a firearms violation. They said that he also bragged that he was a professional boxer. He had inquired of the SOIs about purchasing a firearm in Lewiston, and SOI #1 cautioned the agents that he might have acquired a firearm by now.

The SOIs told the agents that the man had been distributing crack cocaine since his arrival in Lewiston, and that he had concealed multiple ounces of crack cocaine, packaged in customary sizes for immediate resale, "within his butt cheeks." The agents drove the SOIs around the downtown Lewiston area in an attempt to locate this person. At around 2:20 p.m., both SOIs pointed to the defendant, who was walking south on College Street, and identified him as the seller. The agents saw the defendant as a large black man who appeared to weigh more than 230 pounds, although he was wearing a jacket that made it difficult to estimate his weight. The agents drove on, and dropped off the SOIs at a point where they could not be seen by the defendant. They contacted the Lewiston Police Department to ask for assistance in stopping and

identifying the suspect. Detective Trevor Campbell of the Lewiston Police Department and DEA Task Force Agent David Levesque responded. Dumond and Clifford picked them up at the Lewiston police station.

Within 5 to 10 minutes after they left the station, the agents saw the defendant exiting Kennedy Park at the corner of Spruce and Knox Streets. This was a high-crime area, about 200-300 feet from the Lewiston police station. The agents drove up next to the defendant and got out of the car. Clifford initiated contact with the defendant, identifying himself and the others as police officers and asking to speak with him. None of the agents or officers was in uniform, and no marked police cruiser was present.

The defendant agreed to stop and talk with Clifford. He said that his name was Anthony Jones, gave Clifford his date of birth, and said that he was from South Boston. One of the agents tried unsuccessfully to get background information on the defendant from the electronic equipment available to the agents at the scene. The defendant produced a Massachusetts identification card or driver's license. Clifford patted him down for weapons. When Clifford got close to the defendant's buttocks area, the defendant said, "You don't have probable cause to search me," and told Clifford to stop. Clifford continued the pat-down, after which he was satisfied that the defendant was not carrying a weapon.

Clifford had felt that he thought was a large amount of cash in the defendant's pockets and asked him to remove it. The defendant said that he had about $500, which he had earned making deliveries in Boston. He declined to remove it from his pockets. Clifford then asked the defendant whether he was on probation. The defendant said that he was on probation for a felony offense involving guns for which he had served three years in prison. In response to Clifford's question, the defendant said that his probation officer was not aware that the defendant

was in Maine, and that he was free to travel wherever he wished without informing his probation officer. He said that the only condition of his probation was to report to his probation officer. He told Clifford that his probation officer was Matt O'Toole, but was unwilling or unable to provide contact information for Mr. O'Toole,

In Clifford and Dumond's individual experience, each with over 100 probationers, both from Maine and from other states, the conditions of probation are never limited to a duty to report. In their experience, all probationers must at least notify their probation officers before leaving the state in which they reside. They both have had almost daily contact with probation officers and find it useful to talk to them about the individuals they supervise, particularly because the conditions of probation often allow for searches of the probationer and his or her residence. They did not believe that the defendant was allowed to leave Massachusetts without informing his probation officer.

The defendant told Clifford that he had arrived in Lewiston by bus, but then quickly said that in fact a friend had dropped him off in Lewiston and returned to Massachusetts. He said that he was visiting a friend who lived on Ash Street. By this time, both Clifford and Dumond believed that the defendant was probably carrying crack cocaine and was probably in violation of the conditions of his probation. One of them called several other police departments in an unsuccessful attempt to find a K-9 unit on duty that could check the defendant. Clifford wanted to locate and contact the defendant's probation officer, but did not want to do that from the street because he and the two other undercover drug agents would be exposed in a high-crime area and the defendant was a large professional boxer. Clifford had been injured in the past when a 130-pound suspect attempted to flee. He also knew that the fastest way for him to obtain O'Toole's contact information was to use a computer at the Lewiston police station. They were close to the

police station, so he asked the defendant whether he would mind coming to the police station while the agents contacted O'Toole. The defendant asked whether he was under arrest. Clifford said that he was not under arrest but would be detained until his probation officer could be contacted.

Clifford drove to the police station, and the other agents walked to the station with the defendant. One agent was holding the defendant's arm lightly. The defendant was taken to an interview room inside the police station. Dumond stayed in the room with the defendant while he made two or three calls on his cell phone. Video recording equipment was available in the interview room but was not used. The agents generally do not record their interviews with suspects.

Clifford went directly to the report room, where he logged on to a computer and conducted a Google search for O'Toole. It did not take him long to find a telephone number in Massachusetts. After making two telephone calls, he reached O'Toole, who said that he was the defendant's probation officer, that the defendant was on probation for possession of a weapon without a license, and that he was not allowed to leave Massachusetts without written permission from O'Toole, which he did not have for a trip to Maine. Government Exhibit 1 is the defendant's probation contract. The defendant was aware of this condition. After Clifford told O'Toole that the defendant was being detained and suspected of having a large amount of crack cocaine on his person, O'Toole said that he would get an arrest warrant for the defendant immediately and asked Clifford to hold the defendant while he did so.

While waiting for the warrant, Clifford got permission from the watch commander to call in a Lewiston K-9 unit that was off-duty. He called officer Jason Nadeau, who responded with his drug dog Ailos within 15 minutes. The defendant was handcuffed with his hands in front of

his body and taken outside to the police station's sally port, where Ailos alerted on the defendant's hands. To Nadeau, this meant that the defendant was either in possession of illegal drugs or had handled them recently. The defendant was told that the dog had alerted on his hands and that the agents were going to get a warrant for his arrest from Massachusetts. They did not search the defendant at this time, as he would not consent to a search, and the officers wanted to wait for the warrant.

Ailos is a certified drug detection dog. He and Nadeau have been working together as a K-9 unit since November 2006. He has proved reliable in detecting controlled substances. Ailos is trained to seek the strongest odor, and to sit when he finds it. This is called "alerting." He began sniffing the defendant in the area of his buttocks, then moved around until he reached the defendant's hands, where he alerted. Ailos had alerted on suspects at least 25 times before. Nadeau had him "detail" the defendant by searching up one of his legs and down the other, but he did not alert anywhere other than the defendant's hands. There was no videotaping capacity in the area where Ailos sniffed the defendant.

O'Toole called Clifford at 3:20 p.m. to report that he had obtained a warrant for the defendant's arrest from the Norfolk County Superior Court; Clifford received O'Toole's fax of the arrest warrant at 3:32 p.m. Government Exhibit 2 is a copy of the arrest warrant. Clifford gave a copy of the warrant to the defendant in the interview room and explained what it was. This occurred less than an hour after the agents' initial contact with the defendant. Dumond then read the defendant his *Miranda*[1] warnings, stopping after each warning until the defendant indicated that he understood. The defendant then waived his rights, said that he had crack cocaine in his underwear, and offered to retrieve it. He lowered his pants, and Clifford removed a packet from between the defendant's buttocks. The agents also discussed with the defendant at

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

this time the possible benefits of cooperation. If the defendant had refused to allow a search of his person at this time, he would have been transported to the jail, where he would have been strip-searched according to jail protocol.

The bag contained a large amount of crack cocaine. The defendant was also carrying $560 in currency, a cell phone, and a Western Union receipt for a wire transfer. He told the agents that he could purchase large quantities of crack cocaine for them but only on conditions that the agents rejected. He said that he did not use crack cocaine himself. He tore up a form that he had partially filled out, and, after Clifford had thrown the torn paper into a trash can, Ailos alerted on the trash can. While Clifford was testing the contents of the bag, the defendant said that he had told his girlfriend or significant other that this was going to be his last trip, because the risk did not outweigh the reward.

Clifford did not take notes during the conversation with the SOIs, nor did Dumond. Only Nadeau and Clifford wrote reports about the events of October 23, 2008. It is the practice of the DEA Task Force that only one agent will write a report for a given arrest. Clifford feared that, even if he had probable cause to arrest the defendant on the street, if he did so and no crack cocaine was found, he would open himself to a civil lawsuit. He testified that the defendant was free to go until he was escorted to the police station. He testified that he defines probable cause as "more likely than not." He wanted to search the defendant for drugs, and the probation angle presented itself as a tool to accomplish this.

## II. Discussion

The defendant contends that, at the moment that Clifford told him that he was being taken to the police station and was not free to leave, he was under arrest, and that the agents lacked probable cause for that arrest at that moment. The government responds that the defendant was

not under arrest until Clifford showed him the Massachusetts arrest warrant and told him that he was under arrest.

The starting point for the court's analysis is the principle that "an investigatory stop constitutes a de facto arrest when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004) (citation and internal punctuation omitted). The defendant seizes on this excerpt from the *Flowers* decision, Motion to Suppress ("Motion") (Docket No. 21) at 5, but ignores the immediately following sentences, which reads:

> However, in a borderline case where the detention at issue has one or two arrest-like features but otherwise is consistent with a *Terry*[2] stop, it will not be obvious just how the detention at issue ought reasonably to have been perceived. Such a case requires a fact-specific inquiry into whether the measures used by the police were reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop.

*Flowers*, 359 F.3d at 29-30 (citation omitted). In this case, counsel for the defendant points to the following as "arrest-like features": he was not allowed to leave when he asked on the street whether he was free to go, the agents "retained his identification," he was detained in an "interrogation room" at the police station, he was "subjected to a drug sniffing dog," he was handcuffed, he was "forced to return to the interrogation room" after the dog sniff, Motion at 5-6, one of the two or three agents who escorted him to the police station was holding his arm, and he was asked questions designed to elicit incriminating information.

The First Circuit has cited with approval, *United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998), the statement by the Fifth Circuit that bringing a suspect to a police office effects a marked increase in the coercive nature of a detention. *United States v. Berry*, 670 F.2d 583, 598 (5th Cir. 1982). I am unaware of case law holding that being subjected to a dog sniff is an

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

9

incident indicative of arrest or that being asked questions designed to elicit incriminating information is any indicator either. Indeed, the type of questions expressly allowed during a *Terry* stop may elicit incriminating information. A dog sniff is not a search under the Fourth Amendment, *United States v. Place*, 462 U.S. 696, 706-07 (1983). The Fifth Circuit holds that the fact that a defendant was handcuffed is "irrelevant" to the evaluation of a claim of illegal search or seizure when "handcuffing [the defendant] did not cause the officers to find the evidence" at issue. *United States v. Moore*, 329 F.3d 399, 404 (5th Cir. 2003).

That is certainly the case here. In this case, the testimony of Clifford and Dumond established that they had a reasonable belief that the use of handcuffs when they took the defendant to the sally port for the dog sniff was necessary to carry out the legitimate purposes of the initial stop, which led to the use of the dog. *See Flowers*, 359 F.3d at 30. Further, police questioning that does not increase the duration of a *Terry* stop cannot transform an investigative stop into an arrest. *United States v. Shabazz*, 993 F.2d 431, 436-37 (5th Cir. 1993). *See also United States v. Quinn*, 815 F.2d 153, 155 (1st Cir. 1987) (rejecting claim of *de facto* arrest where defendants' car was blocked in by police car, five officers and a police dog were at scene, defendants' identification was not returned to them, they were kept apart while being questioned, and they were questioned in a remote cottage late at night).

On the other side of this question are the facts that the agents were not in uniform, they arrived at the street corner in an unmarked car, they did not brandish weapons, Clifford told the defendant that he was not under arrest but was being detained until the agents could verify the information that the defendant had provided about the terms of his probation, and the defendant was allowed to keep his cell phone for some time in the police station and to make calls with it.

While the duration of the stop in this case – as much as an hour – is cause for concern, there is no "hard-and-fast time limit for a permissible *Terry* stop." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Id.* I see no evidence in this case that the agents were dilatory in investigating the defendant's probation status once he asserted that the only condition of his probation was that he report in to his probation officer, an obviously incorrect statement to the two experienced law enforcement officers. These are circumstances that developed during the course of the stop, from the defendant's responses to unobjectionable questions. *Flowers*, 359 F.3d at 30. Clifford reasonably believed that the fastest way to contact the probation officer, for whom he had only a name and a state, was to use the internet to which he had access at the nearby police station. The agents' reasons for choosing not to continue standing with the defendant on the street in a high-crime area while Clifford did so are eminently reasonable.

I also fail to see any evidence that the agents were dilatory in investigating the initial information that had been given to them about the defendant's sale of crack cocaine. Clifford had felt what he reasonably believed to be packets of cash in the defendant's pockets during his pat-down. The defendant had admitted that he was carrying an unusually large amount of cash, while giving a weak explanation for the fact that he was doing so. It was certainly reasonable for the agents to try to get a drug dog to sniff the defendant, who had already corroborated much of what the SOIs had told Clifford and Dumond. The SOIs would not have any apparent means of

11

learning those facts other than those which they related to the agents: that they had purchased crack cocaine from the defendant that day. Much longer delays waiting for a drug-sniffing dog than that which occurred here have been held not to convert an investigative stop into a *de facto* arrest. *See, e.g., Quinn*, 815 F.2d at 156 (20-25 minute delay); *United States v. Donnelly*, 475 F.3d 946, 950-51, 954 (8th Cir. 2007) (59 minutes); *United States v. Garrido*, 467 F.3d 971, 974-76 (6th Cir. 2006) (45 minutes to one hour). Again, the officers' reasons for moving to the nearby police station to wait for the dog are clearly reasonable.

The defendant relies heavily on the agents' lack of a "track record" with SOI #2 and Clifford's brief history with SOI #1, but the information that they provided, including their apparently certain identification of the defendant himself, was sufficient to justify the initial stop. Thereafter, the defendant himself corroborated enough of the information that the SOIs had provided, and made sufficiently unbelievable statements, to furnish the agents with a reasonable basis for further investigation. On the question whether a *de facto* arrest occurred at all, the alleged unreliability of the informants has no bearing.

I conclude, based on the totality of the circumstances, that, while the question is close, the defendant was not arrested until the agents told him that he was arrested. Accordingly, no *Miranda* violation occurred, and the motion to suppress should be denied.

Should this question be decided in favor of a *de facto* arrest, when the defendant was taken to the police station, *see, e.g., United States v. Baker*, 203 F.3d 827 (table), 1999 WL 1234383 (5th Cir. Nov. 23, 1999), the result would still be the same because I conclude that the agents had probable cause to arrest the defendant at that time. Arguing orally at the close of the hearing, counsel for the defendant asserted that "if the officers had confidence in what the informants told them, they had probable cause to arrest the defendant on the street, and a search

incident to an arrest is always legal." He contended that the agents must have concluded that they did not have a basis on which to proceed beyond the *Terry* stop, because they did not arrest the defendant there but rather took him to the police station while they investigated further. This, he asserted, was the equivalent of an arrest without probable cause.

However, as counsel for the government pointed out in rebuttal, at issue here is not the subjective beliefs of the officers but rather an objective standard of probable cause. *United States v. Garner*, 338 F.3d 78, 80 (1st Cir. 2003).

> Probable cause exists when the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense. In other words, we consider the totality of the circumstances in evaluating whether the government demonstrated a sufficient [p]robability . . . of criminal activity. Probability is the touchstone. . . . [T]he government need not show the quantum of proof necessary to convict.

*United States v. Fiasconaro*, 315 F.3d 28, 34-35 (1st Cir. 2002) (citations and internal quotation marks omitted).[3]

It is in this context that the defendant's attack on the reliability of the SOIs is relevant. A tip from a single informant may provide probable cause for arrest. *See McCray v. State of Illinois*, 386 U.S. 300, 302-04 (1967). Here, SOI #1 had provided information to Clifford on one previous occasion, about two different locations, which Clifford had been able to verify. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) (importance of known informant); *Fiasconaro*, 315 F.3d at 35 (track record of reliability). Both SOIs were certain of their identification of the defendant, and both admitted, to their potential detriment, that they had purchased crack cocaine

---

[3] I do note that Clifford testified that he defined probable cause as "more likely than not." If the agents' subjective beliefs were to be considered here, that erroneous definition applied, in Clifford's mind, a higher standard than what is legally required. Surely an arrest cannot be illegal because the officer involved had probable cause for the arrest but erroneously believed that he did not.

13

from the defendant that day. *See United States v. Vongkaysone*, 434 F.3d 68, 74 (1st Cir. 2006). And the defendant, when questioned by Clifford, corroborated many of the factual details that the SOIs had provided. The agents could observe the SOIs' manner while relating the information, *see United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004), and knew where to find them if their information proved false.

Both agents testified that they believed, following Clifford's conversation with the defendant, that the defendant was in possession of crack cocaine, based on the information provided by the SOIs and the defendant's responses to Clifford's questions. While that subjective belief is not at issue, I conclude that the totality of the circumstances present when Clifford decided to take the defendant to the police station demonstrated a sufficient probability of criminal activity by the defendant to justify an arrest. The only interrogation that occurred after the defendant was taken to the police station and before the *Miranda* warnings were given that is apparent in the evidence presented at the hearing did not in fact elicit any incriminating statements by the defendant. Thus, there would be nothing to suppress even if a *de facto* arrest occurred as early as the moment when Clifford told the defendant that he was not under arrest but would have to come with the agents to the nearby police station.[4]

### III. Conclusion

For the foregoing reasons, I recommended that the proposed findings of fact be adopted and the motion to suppress **DENIED**.

---

[4] I note that the agents also clearly had probable cause to arrest the defendant when Ailos alerted on his hands, given the undisputed evidence of the dog's reliability. *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999).

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of January, 2009.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge